By the Court,

Bronson, J.
For some of the principles which must guide our determination, it will be sufficient to refer to the case of Sharp v. Speir, (ante, p. 76,) which has just been decided. Although the corporation has not been very explicit in telling us how much they intended to do, it sufficiently appears from the case that North Third-street had been previously laid out upon the village map, and that at this time the corporation attempted to accomplish two things—first, to acquire the necessary lands for the purpose of opening the street, and then to assess the price of the land taken and the other necessary expenses of opening, pitching and regulating the street, upon other lands. A portion of the land belonging to the children and heirs of John Sharpe, of whom the plaintiff is one, was taken for the street, and the residue was assessed and sold for the benefit which they were supposed to derive from the improvement. The children have thus lost all—at least for a long term of years; but if the proceedings were authorized by law, and have been properly conducted, they must bear the misfortune. On the other hand, it was the business of the purchaser and those claiming under him, to examine the power and regularity of the proceedings ; and if their title is found defective, they will have no just ground for complaint, unless it be against the corporation.
The first question will be upon the proceedings for taking *97 that portion of the plaintiff’s land which is occupied by the street. The village of Williamsburgh was incorporated in April, 1827. (Stat. of 1827, p. 270.) The 24th section of the act provides, that “ the trustees of said village shall or may, on an application in writing of a majority of the persons owning the property described in any such application, and who are intended to be benefitted thereby, or whose property shall be assessed for the payment of the expense attending the same, and upon such application, they are hereby fully authorized and empowered to widen and alter all public roads, streets and highways already laid out in said village” &c. u and also to lay out and make such other roads and streets, conformable to the map of said milage, as they shall think necessary or convenient for the inhabitants.” The section then goes on to provide for acquiring the necessary lands “ through which such new roads or streets are to run.” The section is rather a clumsy performance in the way of legislation; but from this and other provisions in the act, taken in connection with the facts disclosed by the case, I infer that a map had been made of the village prior to 1827 on which the streets had been laid down, some of which were then open, while others only appeared upon paper. This section was intended to pr vide for altering the streets already made, and for opening others ee conformable to the map.” North Third-street had been laid out on the map, and it was now proposed to open it. That could only be done on such an application in writing as has already been mentioned. Let us see what authority the trustees had to proceed. They had a paper signed by fourteen persons, in which they “ suggest the propriety of having the street opened.” If this can be called “ an application” to have the street opened, there are other difficulties which are insuperable. Although the petitioners say that they are (< inhabitants in and about North Third-street,” they do not “ suggest” that they own a single foot of land in the street, or elsewhere; nor is any land “ described” in the application, as the statute requires. There are only fourteen petitioners, while there are *98 forty-four different assessments. And although some names appear more than once in the assessment, nearly thirteen hundred feet of front on the street is set down as belonging to “ unknown owners.” How many there may have been of this unfortunate class of citizens, it is impossible to say. The burden lay on the defendant of showing that the application came from “ a majority of the persons owning the property,” and he has not only failed to show it, but the evidei ce is nearly or quite conclusive that a majority did not apply. The trustees, therefore, had no authority whatever to open the street, and the plaintiff’s land in the site of the- street has not been taken according to law. She owns it still.
There is a further difficulty about the taking of land for the street. The 24th section provides that when the trustees shall require any land for that purpose, u they shall give notice thereof to the owners or proprietors of such lands, or his or their agent or legal representative, to the end that reasonable satisfaction may be made for all such lands as shall be taken and employed for the use or uses aforesaid, and the said trustees may and are required to treat and endeavor to agree with the owners and persons interested therein, or his or her or their agent, or legal representative, and if in case any such owners or proprietors shall refuse to treat for a reasonable compensation, in manner aforesaid, then and in such case the true value of the land and damages shall be set and appraised by two justices of the peace of the county of Kings, by the oath of twelve freeholders and the payment or tender of the money “ shall be a full authority to the said trustees to cause the said lands to be converted for the purposes aforesaid.” There is no pretence that the trustees-gave notice to the plaintiff, or to any of the other heirs of John Sharpe, or to any agent or representative of theirs, that the 'land was required ; nor that the trustees made any attempt to treat or agree with the owners, or any of them ; and until that had been done, there was no authority for calling a jury. (Rex v. Croke, Cowp. 26 ; Rex v. Manning, 1 Bur. 377 Rex v. Mayor of Liverpool, 4 id. 2244.)
*99 But it. is said that the plaintiff and the other heirs of John Sharpe were “unknown owners,” and therefore the .trustees could neither give notice, nor treat with them. I answer, it was the business of the trustees to find out the owners, and there is no reason to suppose that it could not have been done, and that too with very little trouble. John Sharpe died in the city of New-York only two years before these proceedings were instituted, and he was in possession of the property at the time of his death. If it had been thought' a matter of the slightest importance, to follow the statute, and regard the rights of owners, these heirs would have been found, instead of resolving that “ notice be put upon the lands of all unknown owners.” Whether a white wand was actually put up upon the lands to let the owners known that they were in danger, does not appear, nor is it a matter of any importance. When the statute says, you shall give notice to and treat with the owner, it cannot be satisfied by sticking up a notice on the land. That is not a sufficient ambassador.
Let it be granted that these “ unknown owners” could not have been found even if a diligent inquiry had been instituted, and what then 1 It does not follow that their land might be taken. The difficulty of complying with a statute does not repeal it. The trustees were acting under a naked power. If the power was too strait for practical utility, they should have asked a new grant; or if they did not choose to do that, they should have answered the petitioners, “We have no authority to take any man’s land for a street until after we have given him notice, and endeavored to treat with him.”
Whether an application to these heirs would have been likely to result in a treaty or not, can be a matter of no importance. It would at least have served the purpose of giving them notice, and then their land might have been saved. When lands are to be taken under a statute authority, in derogation of the common law, every requisite of the statute having the semblance of benefit to the owner must be strictly complied with. (Atkins v. Kinnan, 20 Wend. 241.) Although this *100 doctrine may have been often disregarded by city and village corporations, we think it both good law and good morals. The legislature has not been too careful in protecting the rights of the land owner. On the contrary, a wide door has been opened for taking private property without the consent of the owner, whenever his neighbors happened to think that the public interest required him to sell. None of the barriers which remain ought to be thrown down.
Williamsburgh is a road district, and the trustees have all the powers within the village which formerly belonged to the commissioners of highways of the town of Bushwick. (Sess. L. of ’27, p. 275, § 17.) But that does not bring the case within the decision in Graves v. Otis, (2 Hill, 466 ;) for the street was not laid out, nor the damages ascertained in the manner prescribed by the act relating to the highways on Long Island. (Sess. L. of 1830, p. 51, § 47—53.) The trustees evidently proceeded, or rather professed to proceed, under the 24th section of the charter.
There is still another difficulty with this attempt to take land for the street. The justices and jury valued the land and damages by blocks, one of 420 feet front, the second 460 feet, the third 510 feet, the fourth 460 feet, and the fifth without saying how many feet front “ running measure” there was in it. The first block was valued at $3 per foot, the second at $2,75; the third at $2,50, and the fourth and fifth at $2 per foot front. Now as the land decreased in value from the starting point to the other end of the street, it is morally certain that all óf the lots in the same block were not of equal value, and consequently the owner of one lot either got too much, or the owner of another lot got too little. We do not understand the case of Coles v. The Trustees of Williamsburgh, (10 Wend. 659,) as sanctioning this valuation. The justices and the jury should have proceeded by lots instead of blocks.
We come now to the assessments which were made to pay the expenses of opening, pitching and regulating the street, under which the lot in question was sold. The trustees of tl e village have authority to direct iC the pitching, regulating and *101 paving the streets thereof,” and also “ the altering, amending and cleansing of any street.” (Sess. L. of ’27, p. 276, § 21.) But “ no street” a shall be pitched, paved, altered or .amended, unless the same shall be requested in writing by a majority of the persons owning the property intended to be benefited thereby, or whose property shall be assessed for the payment of the expenses att end-ding the same.” (§ 22.) And the 24th section, which gives authority “ to lay out and make” streets, contains, as we have already seen, a like restriction upon the power of the trustees. The petition, such as it was, on which the trustees acted, has already been noticed on another branch of the case. There is no evidence that a majority of the land owners requested this improvement, and it is enough that the fact was not proved. But there is, in addition, very satisfactory evidence that the fact did not exist. The trustees acted without authority, and their proceedings were consequently void.
Although this is enough to dispose of the case, some of the other questions discussed at the bar ought, perhaps, to be briefly noticed. As to the lands taken for the street, the expenses were to be <c assessed among and upon the owners and occupants of the several houses and lots intended to be benefitted.” §25.) And the other expenses were to be assessed u among the owners or occupants of all the houses and lots to be benefitted thereby.” The two provisions are substantially alike, though there is a slight difference in words. The property on the street had been surveyed and divided into lots of twenty-five feet front long before, and the lots were undoubtedly owned by different individuals. It appears, at least, that the plaintiff owned one such lot in a block of 429 feet front on the street. Now what was done 1 The assessors were not furnished with a map, or any information concerning who was to be assessed ; but they were sent out with a tape line to discover as well as they could both lands and owners. They measured and assessed by blocks, instead of lots, though as to some of the blocks they put down the names of several individuals as the owners of separate parcels. But when they came to *102 the plaintiff’s land, her lot of twenty-five feet front was lumped with other lands, amounting in all to 429 feet front, and the whole set down to “ unknown owners.” The clerk of the corporation testifies that the assessment was not made in the usual mode, which was to assess by lots, instead of blocks, which were specified in the assessment. But independently of this departure from the usage, it is impossible to maintain such an assessment as was made here. Where the lands in a city or village have been surveyed and laid out into lots, the owners should be assessed by lots, and each owner should be assessed by himself, and in respect of his particular land. (The King v. The Trustees of Norwich, 5 Ad. & Ellis, 563.) It may well be that'every lot in the same block is not of equal value. And besides, the assessment must be so made that each owner may know what is his particular burden, and be able to discharge it without calling in the aid of others. If this 429 feet front was properly assessed in one body, the corporation was not obliged to receive less than the whole charge imposed upon it, and thus the plaintiff might have been compelled to pay the assessments upon other persons, or lose her own land. The statute does not authorize an assessment upon owners generally, but says it shall be made “ among” the owners ; and to make the matter still more clear, it provides that the assessment shall be among the owners of “ the several houses and lots.” The assessors might just as well have put down all the land on the street in one lump, as to do what they have done There was an utter failure to comply with the requirement of the statute in this particular. The power has not been pursued, and the sale consequently conferred no title on the purchaser.
The assessment was vicious in another respect. The only authority to sell is, where there is a tax “ on lands or tenements.” (Sess. L. of ’27, p. 279, § 26.) If the word u tax” includes a street assessment, it must still be an assessment “ on lands or tenements.” Here we have nothing but one line of the boundary of any land. The assessors have assessed certain sums on a given *103 number of feet front, without saying whether the land extends back one foot or one hundred—whether it goes quite through to the next street, or only part of the way. If they had referred to the map, and mentioned lots as there laid down, that would have answered. But neither map nor lots are mentioned. I do not mean to censure the assessors. They did, perhaps, the best they could with a tape line, and they had no other guide.
When the assessment is completed, the trustees are required to give fourteen days notice that the same will be ratified and confirmed within one month, unless satisfactory objections are made. (§ 21, 25.) It does not appear that any notice was given. And here I will repeat, that the burden of showing that the power has been duly executed lies on the purchaser, and without proving it, his title is good for nothing.
The trustees are not authorized to sell any land until the collector has made affidavit that the owner cannot be found, or, if found, that he has not sufficient personal estate in the village to pay the tax. (§ 26.) Ho such affidavit was produced, nor was its absence accounted for, if it ever existed. If every thing else had been regular, the want of an affidavit would be fatal to the sale.
I am weary with pointing out defects in these proceedings, and will go no further. I ought however to say, that by assuming, as has been done, that this corporation might, under any circumstances, sell lands-for the payment of an assessment, it must not be inferred that we are of opinion that the power exists. There is no power to sell lands, except for a tax, (§ 26;) and although these street assessments are made a lien on the land, (§ 21, 25,) it does not follow that the corporation can sell the land without first going into chancery, and obtaining the aid of that court to enforce the lien. My impression is, that the lien cannot be enforced at law; but upon that point we give no opinion either one way or the other.
Hew trial denied.